

CARLA SANDERSON

ATTORNEY   NY, NJ, SDNY, EDNY

260 MADISON AVENUE  FL 22      T 646.499.3818
NEW YORK, NEW YORK 10016       F 646.499.3814
carla@carlasandersonlaw.com    carlasandersonlaw.com

April 2, 2024

<u>**Via ECF**</u>

District Judge Hon. Paul A. Engelmayer
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    *United States v. Rowson, et al.*
       22 Cr. 468 (JLR)

Dear Judge Engelmayer,

Michael Gant respectfully submits this letter in advance of his sentencing scheduled for April 16, 2024. Michael comes before the Court taking full responsibility for his actions. Over the last year, Michael who is now 22 years old, has taken his rehabilitation seriously. Michael wants the Court to know that he understands the grave harm he caused others and wishes he could change the past. During his time in custody Michael has sought to understand and improve his mental health and drug addiction, which contributed to his poor choices. Michael's acceptance of responsibility and remorse coincide with his taking his mental health treatment seriously, seeking the assistance of psychology services, completing workbooks wherein he reflects on his actions, and his motivation to stay out of trouble moving forward. This represents a marked break from his past.

Michael survived incredible adversity, including an extremely abusive upbringing as well as becoming homeless and growing up in a blighted and segregated Bronx neighborhood. His resultant substance abuse and mental health problems never received attention and treatment until his incarceration via our persistent efforts. Additionally, Michael had certain cognitive deficits which made him particularly susceptible to negative influences. While Michael's crimes are very serious, Michael is not irredeemable. The data supports this: younger offenders are more likely to rehabilitate than older offenders and less time is needed for them to do so. Michael is a young man who has already started to change for the better and will continue to do so going forward.

## I.    PROCEDURAL HISTORY

On January 26, 2023, Michael was charged via superseding indictment with racketeering conspiracy, three counts of violent crime in aid of racketeering and three counts of discharging a firearm in violation of 18 U.S.C. §§ 1962(d), 1959 (a)(3) and (a)(5) and 924(c)(1)(A)(i), (ii) and (iii). On February 1, 2023, Michael was arraigned on the superseding indictment. Michael

1

consented to detention and has remained in custody, first at Hudson County Correctional Facility until April 17, 2023 when he was transferred to the Metropolitan Detention Center in Brooklyn, New York ("MDC"). On September 5, 2023, Michael pleaded guilty pursuant to a plea agreement to Count One: racketeering conspiracy; and to a lesser included offense of Count Seven: possession of a firearm in furtherance of the July 7, 2020 shooting.

Michael is also facing New York State charges that were filed prior to his federal charges. Michael was arrested in the Bronx on or about July 21, 2020 and charged with criminal possession of a firearm. After being released on bail, Michael was arrested on March 8, 2022 and charged once again with possessing a firearm. He was remanded to Rikers Island and was later charged with attempted murder for the stabbing of an inmate that occurred on or about December 7, 2022. Michael was taken into federal custody on February 1, 2023. Michael's state attorneys have informed counsel that he is scheduled to plead guilty to two counts of attempted criminal possession of a weapon and one count of attempted murder on April 17, 2024. In exchange for his pleas of guilty, he will receive a total sentence of 7 years' imprisonment.

## II.    SENTENCING GUIDELINES

### A. The Plea Agreement

The stipulated guidelines range in the plea agreement is 151 to 188 months' imprisonment on Count One and 60-months' imprisonment on the lesser included offense of Count Seven which must run consecutively to Count One, for a total guidelines range of 211 to 248 months' imprisonment. At his plea hearing on September 5, 2023, Michael acknowledged that he participated in a racketeering conspiracy and that on or about June 20, 2020, and July 7, 2020, in Bronx County, he attempted to murder rival gang members by shooting at them. He also pleaded guilty to possessing a firearm on July 7, 2020, in furtherance of the shooting. He further admitted that the conduct of the racketeering enterprise involved marijuana dealing. Per the plea agreement, Michael acknowledged his participation in a shooting on July 16, 2020, although that offense was not included in the plea agreement's guidelines calculation. The parties arrived at the plea agreement's stipulation pursuant to the following calculations:

Count 1 – racketeering conspiracy:

Predicate Offense One – The Attempted Murder of Victim-1, Victim-2, Victim-3, and Victim-4 on June 20, 2020

Pursuant to U.S.S.G. § 2A2.1(a)(1), the base offense level is 33.

Pursuant to U.S.S.G. § 2A2.1(b)(1)(B), because at least one of the Victims sustained serious bodily injury, an increase of two levels is warranted.

Accordingly, the applicable Guidelines offense level is 35.

Predicate Offense Two – The Attempted Murder of Victim-5 on or about July 7, 2020

2

Pursuant to U.S.S.G. § 2A2.1(a)(1), the base offense level is 33.

Pursuant to U.S.S.G. § 2A2.1(b)(1)(B), because at least one of the Victims sustained serious bodily injury, an increase of two levels is warranted.

Accordingly, the applicable Guidelines offense level is 35.

Grouping Analysis

Pursuant to U.S.S.G. § 3D1.2, Predicate Offense One and Predicate Offense Two constitute separate groups.

Pursuant to U.S.S.G. § 3D1.4(a), Predicate Offense One has the highest offense level, with an offense level of 35, and constitutes one Unit.

Pursuant to U.S.S.G. § 3D1.4(a), Predicate Offense Two constitutes one Unit because it is between 1 and 4 levels less serious than Predicate Offense One.

Pursuant to U.S.S.G. § 3D1.4, two Units results in a two-level enhancement to the highest offense level. The adjusted offense level for Count One is 37.

Acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 results in a total offense level of 34.

Count 2 – possession of a firearm

Pursuant to U.S.S.G. § 2K2.4(b), the guidelines sentence is the mandatory minimum sentence of 60 months' imprisonment, to run consecutively to any other sentence imposed.

**B.  The PSR**

The PSR treats each victim of Predicate Offense One, the June 20, 2020, shooting as a separate count for which a separate guidelines calculation is warranted; adds an additional calculation for the July 16, 2020 shooting as a separate group;[1] and calculates a total guidelines range of 248-295 months of imprisonment. PSR at ¶¶ 47-89. The defense objects to this calculation as Michael pleaded guilty to a count of a racketeering conspiracy and not conspiracy to commit murder. *See* attached objections to the PSR at Ex. A. *See also United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009) ("As this court emphasized in *United States v. Persico*, 832 F.2d 705 (2d Cir.1987), 'the agreement proscribed by section 1962(d) is [a] conspiracy to participate in a charged enterprise's affairs' through a pattern of racketeering, 'not [a] conspiracy to commit predicate acts,' *id.* at 713.").

---

[1] This inclusion does not impact the guidelines calculation.

As with codefendant Iszayah Rowson's sentencing guidelines calculation, it is submitted that the Court need not decide this issue and should apply the plea agreement's stipulated guidelines range as it is among the viable ways to calculate the guidelines. *See also United States v. Fernandez,* 877 F.2d 1138, 1145 (2d Cir. 1989) (District Courts may depart from the correct guideline range "to give effect to the plea bargain."); *United States v. McLeod*, 18 Cr. 691, ECF No. 40 (S.D.N.Y. Feb. 13, 2020) (Koeltl, J.) (departing from a Career Offender Guideline range to give effect to the plea agreement); *see also United States v. Witcher*, 20 Cr. 116 (KMW) (S.D.N.Y. June 29, 2022) (declining to apply Probation's Guidelines calculation and adopting the stipulated guideline range to give effect to the plea agreement).

### III.    LAW GOVERNING SENTENCING

Section 18 U.S.C. § 3553(a) begins with the requirement that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." As the Supreme Court reaffirmed in *Pepper*, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (*quoting Koon v. United States*, 518 U.S. 81, 113 (1996)). In *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), the Second Circuit explained that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it *must* choose the lower sentence. *See id.* at 142 (observing that where a Guidelines sentence is "in equipoise with [a] below-the range sentence," parsimony clause requires imposition of the lower sentence).

When a defendant is facing an anticipated state sentence, the district court must decide whether this sentence will run concurrently or consecutively to the federal sentence. *See Setser v. United States*, 566 U.S. 231, 244-245 (2012); U.S.S.G. § 5G1.3. Guideline § 5G1.3 provides that if the defendant is going to be sentenced for a state offense that is relevant conduct the district court shall run the sentences concurrently and if the state offense is not relevant conduct, the court may run the sentences "concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." § 5G1.3(b), (c) and (d).

### IV.    THE TITLE 18 U.S.C. § 3553(a) FACTORS

Youth like Michael who suffer repeated trauma without proper intervention are more vulnerable and susceptible to ending up in the criminal justice system. The verbal and physical abuse that was inflicted on Michael as a child impacted his mental health and led to substance abuse addiction. *See* Exhibit B, Mitigation Report by Lisa Orloff, LMSW, ACSW at 5-14. He was a vulnerable teenager when he became involved with a gang. While this is no excuse for the violence Michael engaged in, it is important context to consider in fashioning a sentence. Importantly, Michael has made real efforts to turn his life around. Despite facing an extremely lengthy prison term, Michael has grown through self-reflection and making better choices while incarcerated. He accepts responsibility for his conduct, feels remorse and has expressed the wish to change the past: "I want to apologize to the familys [sic] I caused trama [sic] to. I know what I did was wrong and I apologize. I'm taking full responsibility for my actions. I made many bad

4

choices. If I could go back in the past and change what I did I would." *See* Michael Gant letter at Ex. C. While we understand that punishment, deterrence and protection of the public are all significant factors here, we urge the Court to strongly consider the data surrounding youthful offenders and their greater likelihood of rehabilitation.

### A.    Michael Gant's History and Offense Conduct

Michael Gant is recalled by family and friends as a kind and caring child. "Mikey was always a good-hearted trustworthy kid, who loved his family and never hesitated to help anyone." *See* Negus Martin letter at Ex. D. When Michael was a young teenager he would frequently travel to Brooklyn from the Bronx and give up his weekends to help his uncle by washing dishes. *Id.* at 2. He was not paid and did this just to help. *Id.* "Michael is one of the sweetest kids and anyone who spends more than 5 min. with him can see it. Hes Always had a good heart. I Remember when ever I would take him to the playground or carnival (which was often) he would Always make friends and would share whatever he had. And he would never let anyone get picked on Around him. Either he would stick up for them and/or come get me to handle it." *See* letter from Michael Gant Sr. at Ex. D. "Michael is a good kid with a good heart. I know this may be hard to believe considering the circumstances." *See* letter from Latasha Best at Ex. D.



Michael dropped out of high school in 12th grade (having only enough credits to be considered in 9th grade). PSR ¶ 124. As Dr. Sanford Drob notes in his Forensic Psychological Evaluation,

> Michael exhibits extreme deficits on tests that assess even more basic language skills, and it appears likely that his deficits in this area are neuropsychological in origin. His limited vocabulary and fund of information can likely in part be attributed to severe attention deficits that was likely present throughout his childhood. These attention deficits themselves appear attributable to an

> attention deficit hyperactivity disorder and family discord resulting
> in anxiety that further compromised his focus at school.
> Ex. E at 8.

With a full-scale IQ of 71, Michael possibly suffers from intellectual disability. *Id*. at 6, 13. "He has very significant deficits in verbal reasoning, vocabulary, fund of information, common-sense reasoning and social judgment." *Id*. "Michael's cognitive functioning, appears to be compromised both by learning deficits and emotional difficulties." *Id*. at 9. Considering the horrors he experienced at home, as well as other challenges such as homelessness and exposure to drugs and violence in his blighted neighborhood, Michael had little chance. During Michael's teenage years, Michael resorted to drugs and quickly became addicted to marijuana, lean (a mixture of prescription-grade cough or cold syrup with codeine and promethazine), and Percocet.

Michael's learning and intellectual deficits were exacerbated by the trauma of his surroundings. As a vulnerable teen, he was recruited as a member of Third Side, becoming another soldier in a back-and-forth battle among warring groups within the neighborhood. In June and July 2020, at the behest of Third Side, he participated in three gang related shootings. The June shooting injured four victims, including one person who was shot in the jaw. In July 2020, Michael and another individual shot a victim [in the back].[2] Michael was eighteen years old at the time.

Michael grew up in urban warzone both on the streets and at home. *See* Orloff Repot, Ex. B, 11-12. Without a family support system, which often provides the only hope for those from neighborhoods like Michael's, he lacked the supervision and guidance needed. Research indicates that one's home life is extremely important. "Had the defendants been raised by cohesive, adequate families, most of the difficulties they encountered would probably never have come to pass. Well-resourced, attentive parents would have had the knowledge, ability, and insight to protect their children from many of the difficulties that befell these defendants in their youth, to obtain assistance to deal with their psychological and physical problems, and to obtain crucial opportunities for education, work, and personal growth. Even those with learning disabilities would likely have been provided available resources to overcome their impairments at public expense.  That the defendants were born into circumstances without such support is at the center of this tragedy." *See United States v. Bannis*ter, 786 F. Supp. 2d 617, 688-89 (Jack B. Weinstein) (E.D.N.Y. 2011). Unlike others from loving homes, including his codefendant Mr. Rowson, who was apparently well-cared for and "lavished with love and affection,"[3] Michael had the opposite experience. Danger lurked at every turn, especially within his home where violence and cruelty reigned.

### B.      Michael's Young Age Is Grounds for a Below Guidelines Sentence

The PSR recommends a significant downward variance from Probation's guidelines calculation on Count One from 188 months to 128 months due to Michael's "young age at the time of the offense, this being his first conviction, his abusive upbringing, his drug use history, and

---

[2] This victim was later murdered by other individuals.

[3] The transcript of Mr. Rowson's sentencing has been requested but not yet received.

mental health concerns." PSR Sentencing Recommendation at 38-39. Sentencing courts should generally impose lesser sentences on young offenders than on similarly situated adult offenders. *See United States v. Andrew Ramsay*, 96-Cr-1098 (JSR) ECF Doc. No. 68 (S.D.N.Y. May 11, 2021) (granting reduction of life sentence to defendant who was 17 years old at time of crime). Brain development is not complete at age 18 when Michael committed his offenses and continues into one's mid to late twenties.[4] Indeed, the Supreme Court relied on scientific research in barring the death penalty and limiting mandatory life without parole for juveniles. *See Miller v. Alabama*, 567 U.S. 460, 477 (2012). Therefore, "criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Graham v. Florida*, 560 U.S. 48, 76 (2010). The United States Sentencing Guidelines are flawed to the extent that they do not account for Michael's young age at the time of his crime.[5]

The primary attributes relevant to sentencing of young offenders are their immaturity, susceptibility, salvagability, and dependence. *Ramsay*, supra at 18; *see also Montgomery v. Louisiana*, 136 S.Ct. 718, 733, L.Ed.2d 599 (2016) (*quoting Miller*, 567 U.S. at 471) (youth's lack of maturity and impetuosity; youth's susceptibility to outside influences, especially negative influences; and youth's capacity for change are the primary distinguishing factors in sentencing adult and young offenders). "[B]ecause juveniles have diminished culpability and greater prospects for reform,…they are less deserving of the most serious punishments." *Miller*, 567 U.S. at 471. Indeed, these developmental characteristics make juveniles less culpable for their crimes. *See Roper v. Simmons*, 543 U.S. 551, 570 (2005), *quoting Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988) ("[juvenile] conduct is not as morally reprehensible as that of an adult."). Accordingly, lengthy sentences that may be appropriate for adults are disproportionate when imposed on juveniles.

As Judge Rakoff explained in *Ramsay*: young age is relevant to consideration of "the nature and circumstances of the offense and the history and characteristics of the defendant" as well as each of the four purposes of sentencing: just punishment, deterrence, incapacitation, and rehabilitation. *Ramsay*, supra at 32-33. "Just punishment" should generally be less severe for a young offender due to their immaturity, susceptibility to peer influence, and their dependence. *Id.* at 33. When it comes to deterrence, due to immaturity and low likelihood of consideration of punishment the value of deterrence is decreased. *Id.* Further, because "adolescent crime is a poor

---

[4] *See* Christian Beaulieu & Catherine Lebel, Longitudinal Development of Human Brain Wiring Continues from Childhood into Adulthood, 27 J. Neurosciences 31 (2011); Adolf Pfefferbaum et al., Variation in Longitudinal Trajectories of Regional Brain Volumes of Healthy Men and Women (Ages 0 to 85) Measures with Atlas-Based Parcellation of MRI, 65 NeuroImage 176, 176-193 (2013).

[5] At Mr. Rowson's sentencing, the government argued in sum and substance that deterrence requires youthful offenders to receive adult length sentences lest young offenders continue to offend because they expect lenient treatment. This argument can be easily discounted. A sentence of a decade or more is long, especially from the vantage point of someone in their teens or early twenties. Moreover, statutes carrying mandatory prison terms, for example, murder in aid of racketeering which carries life without parole, offer deterrence for young offenders by their existence alone.

predictor of future criminal behavior" there is a less of a need to incapacitate. *Id.* at 33-34. Rehabilitation for young offenders is more likely than for similar adult offenders and "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

### C.    The Harsh Conditions of Michael's Pretrial Detention

Michael has experienced harsh conditions of confinement first at Rikers Island and subsequently at the MDC Brooklyn.



This lapse in medical treatment is unsurprising. The BOP has exhibited a disregard for the life and health of its prisoners.[8] Through its investigation into excessive prison deaths, NPR found examples of federal inmates waiting "months or even years for treatment, including inmates with obviously concerning symptoms: unexplained bleeding, a suspicious lump, intense pain," many of these inmates suffered serious health consequences and others dying, including relatively young

---

[8] *See* Meg Anderson, *1 in 4 inmate deaths happens in the same federal prison. Why?* September 23, 2023, NPR, available at https://www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates (last accessed October 4, 2023). The investigation provides multiple examples of preventable deaths resulting from the BOP's inadequate medical care, including 39-year-old Jeffrey Ramirez whose testicular cancer spread to his brain and lungs over the course of a year while he was awaiting treatment, leading to his death at 41; Angela Beck whose multiple breast lumps were not biopsied for more than eight months and another two months before she received surgery resulting in the spread of the cancer; Turhan Law's symptoms from cancer were not treated from April – November 2020. The list goes on.

inmates under 40, from the lack of timely intervention. *Id.* "Federal inmates — a group with a constitutional right to health care yet without the autonomy to access it on their own — are dying more often than they should." *Id.* "Are there preventable deaths happening in the BOP? The answer to that is clearly yes." *Id.*

The Court is well aware of the harsh conditions at the MDC and should credit Michael additional time for this, as well as for the 11 months he spent at Rikers Island where conditions were no better.[9] After the COVID-19 lockdowns began to lift, staff shortages and violence at the MDC have caused continuing lockdowns. Such "lockdown" conditions mean that Michael is often confined to his cell for approximately 23 to 24 hours per day. For many weeks, Michael's toilet in his cell was not working properly. Additionally, programming, treatment options and social visits are limited. Inmates express feeling like they are "rotting away." Michael is also subject to verbal abuse and humiliation by staff. For example, prior to a recent legal visit, a staff member threatened to put Michael, who is Muslim, in the Special Housing Unit ("SHU") for wearing a Kufi. She then asked him to take it off and to give it to her, stating, "Gant, I'm going to give it back to you." After giving it to her, she retorted, "*Not*." Humiliated, Michael wept throughout our attorney client meeting. Michael has filed complaints about this treatment but has not received a response.

In a scathing decision filed on January 4, 2024, Judge Jesse Furman refused to send a defendant who pleaded guilty to selling fentanyl to the MDC upon his guilty plea. *See United States v. Gustavo Chavez*, 22-Cr-303, Doc. No. 31 filed 1/4/2024. Judge Furman detailed the conditions of confinement at the MDC including the "near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care." *Id.* at 1-2. The first of the "dreadful" conditions the Court emphasized was the "inordinate amount of time on 'lockdown'- that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise." *Id.* at 9. As the Court noted, "confining inmates to their cells is, for at least some inmates, tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane." *Id.* at 10 *citing Johnson v. Prentice*, 144 S. Ct. 11, 12 (2023) (Jackson, J., dissenting from denial of certiorari).

The second factor the Court emphasized is how egregiously slow the MDC provides necessary medical and mental health treatment, including necessary gynecological care, failing to transfer an inmate with MRSA infection to a medical facility in defiance of court order, defying a court order to transport a defendant with a fractured cheek for surgery, and denial of a court ordered diet appropriate for an inmate with diabetes. *Id.* at 11-12.

The third factor the Court emphasized was the deteriorated state of the physical infrastructure at the MDC: visible mold on walls and ceilings, contaminated drinking water, vermin infestation, mouse droppings, roaches and flies in the showers, abundant water damage,

---

[9] The deplorable conditions at Rikers Island have been well documented. *See* Jeffrey C. Mays, *As Conditions Worsen at Rikers, New Commission Revives Push to Close It*, The New York Times, October 19, 2023, available at https://www.nytimes.com/2023/10/19/nyregion/rikers-island-jail-close.html (last accessed April 2, 2024).

black mold on lighting fixtures, and inmates with no access to functioning plumbing causing overflowing toilets and inmates to sit "with water on the cell of their floor in the dark with feces on it." *Id*. at 12-13. Tragically, at least four people have committed suicide at the MDC in the past three years.

On March 30, 2024, the Daily News published an article detailing an inmate's claim that the MDC is serving him food infested with maggots.[10]

### D.    Michael's Remorse and Rehabilitation While at the MDC

Over the course of his incarceration Michael's transformation is noticeable. Michael engaged in a concerning pattern of conduct as a gang member that his arrest in 2020 on a firearms charge did not deter. Upon his incarceration in 2022 for possessing a firearm, his misbehavior continued, psychiatry noted that "Michael had been exhibiting radical changes in behavior, constant fighting, being alarmed, and involvement in unusual actions and harmful behavior." *See* Ex. E at 5. However, over the course of the next year, after being transferred into federal custody, Michael began changing his behavior.

 In addition, Michael has been working in the laundry room at the MDC since approximately September 2023 and has received an outstanding performance evaluation. *See* attached performance evaluation at Ex. G.

Indeed, through his interactions with Michael over the course of approximately six months, Dr. Drob witnessed his transformation. "In his last interview with me he stated that as he has sobered up and become involved with more positive influences in jail he realizes that his associations on the street pushed him into this image and he has come to realize that it is not true to himself. He has recently come to express considerable remorse and guilt for his past behavior and reflected on how his abuse of drugs contributed to his offense conduct." *Id*. at 13. "When I examined Michael on January 16, 2024, he presented in a much different manner than when I had seen him in August 2023. He was much less guarded, more affable, and highly communicative. He appeared to have abandoned the guarded, angry, and "gangster" persona that he has presented

---

[10] *See* John Annese, *Maggot-infested meals being served to inmates at Brooklyn federal jail, lawyers say,* New York Daily News, March 30, 2024 available at https://www.nydailynews.com/2024/03/30/maggot-infested-meals-being-served-inmates-at-brooklyn-federal-jail-lawyers-say/ (last accessed April 2, 2024)

within the past, and verbalized that he had come to realize that this persona was not his true nature." *Id.* at 14; *see also* Michael Gant letter Ex. C ("I got rid of AP I am Michael Gant and I am not part of that lifestyle anymore.").

### E.    Deterrence, Protection of the Public and Punishment

Due to the seriousness of Michael's crimes and the severe harms suffered by the victims, we understand that punishment and protection of the public call for a significant sentence. However, this should be considered with Michael's young age and his personal changes, which make future protection of the public and specific deterrence lesser concerns. Michael is still young enough to change the trajectory of his life, and he has already begun the hard work that is needed to do so. The time that Michael has spent incarcerated has significantly impacted Michael. Having never been convicted of a crime, nor served any sentence, the realization that his choices as a teenager will make him spend a significant portion of his life in prison, has affected him dramatically. Michael has genuinely accepted responsibility for his actions in this case and specific deterrence, punishment and protection of the public do not require a sentence of greater than a decade. Moreover, there is research suggesting that a more severe sentence does not lead to greater specific deterrence for individual defendants. *See* The Honorable Peggy Fulton Hora & Theodore Stalcup, Drug Treatment Courts in the Twenty-First Century: The Evolution of the Revolution in Problem-Solving Courts, 42 GA L. REV.717, 724 (2008). And that sentencing defendants to severe sentences does not result in greater general deterrence. *See* Michael Tonry, Purposes and Functions of Sentencing, 34 CRIME AND JUSTICE: A REVIEW OF RESEARCH 28–29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

### F.    Avoidance of Sentencing Disparities

At Mr. Rowson's sentencing, the government acknowledged that a relative culpability determination between Mr. Rowson and Michael is "difficult." While Michael's conduct involved an additional shooting that resulted in injury to a victim, Michael was not a leader of the gang. Instead, the government characterized Mr. Rowson as a leader who proudly boasted about his status as "the face of Thirdside." Michael was also younger than Mr. Rowson and lacked the loving and supportive family Mr. Rowson had. We submit that the additional mitigating factors present for Michael do not call for a sentence any greater than that imposed on Mr. Rowson.

### V.    CONCLUSION

We ask that the Court run Michael's federal sentence concurrently to his anticipated 7-year state sentence to the extent possible - the 60 months for Count Seven must run consecutively to both Michael's sentence on Count One and his anticipated 7-year state sentence. We additionally request that the Court consider the 11 months that Michael spent at Rikers Island as incarceration for relevant conduct and reduce Michael's federal sentence accordingly. *See* § 5G1.3(b)). "Additional months in prison are not simply numbers. Those months have exceptionally severe consequences for the incarcerated individual. They also have consequences both for society which bears the direct and indirect costs of incarceration and for the administration of justice which must

11

be at its best when . . . the stakes are at their highest." *See United States v. Jenkins,* 854 F.3d 181, 192 (2d Cir. 2017).

       We thank the Court for its time and consideration.


Dated: April 2, 2024                                Respectfully submitted,

                                                 /s/

                                          Carla M. Sanderson
                                          Lauren Di Chiara